## Hemrock *v.* Peoples Natural Gas Company, Appellant.

Argued October 5, 1966. Before Bell, C. J., Musmanno, Cohen, Eagen, O'Brien and Roberts, JJ.

*Milton W. Lamproplos,* with him *Eckert, Seamans & Cherin,* for company, appellant.

*William C. Walker,* with him *Dickie, McCamey & Chilcote,* for appellant.

*John E. Evans, Jr.,* with him *Evans, Ivory & Evans,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, November 15, 1966:

On December 6, 1959, Samuel Hemrock and his wife Helen Hemrock, after an absence of several days from their abode, having attended a funeral outside the State, re-entered their home at 21 Virginia Drive in Lincoln Borough at about 3 p.m. They saw nor heard anything which would warn them of any onrushing danger, but, in a matter of minutes after they had crossed the threshold, their house rocked to an explosion which wrecked the entire structure and visited grave disabling and disfiguring injuries to Mrs. Hemrock, leaving her life as desolate as their house was no longer a human habitation.

The Hemrocks entered suit against the Peoples Natural Gas Company which supplied gas to their residence. The Gas Company brought in as an additional

defendant W. W. Alberts, the contractor who had built the house in 1946. The latter was charged with negligence in laying the line which supplied gas to the house, and the gas company was charged with negligence in failing properly to inspect the gas line. The jury returned verdicts in favor of both the husband and wife plaintiffs against both defendants. The defendants have appealed.

In refusing motions for judgment n.o.v. in the lower court, the trial judge, Judge OLBUM, filed an exhaustive and extremely able opinion which disposes properly of every possible question raised by the appellants. This opinion, therefore, does not need to be as extended in length as otherwise the case might require.

In the wake of every man-made disaster, an investigation is held to ascertain the cause for the untoward happening. The examination at the explosion site of 21 Virginia Drive revealed that the pipe carrying gas from the main line into the Hemrock house had broken at a point one foot from the foundation wall. The break in the pipe localized at the threading of the coupling which, inspection demonstrated, was severely corroded. It appeared that the gas, which escaped from this break, moved through earthen interstices to the house wall, and into the closed house where it accumulated in quantity, awaiting the moment of rampage when it could find ignition. The pilot flame in the gas refrigerator supplied this incendiary cooperation and, in consequence, 21 Virginia Drive was no longer a house but a shambles.

What man-made negligence, if any, broke the dike which engulfed the Hemrock home with fire? The plaintiffs submitted a formidable case for negligence on the part of both the Peoples Natural Gas Company and the contractor, W. W. Alberts. The record relates the story of how the consumer's gas line was laid in the ground in 1946 at the time the house was constructed.

Experts testifying for the plaintiff pointed out that there was gross negligence in laying the gas line in what is known as detritus soil.

As one walks or stands on ground, he assumes that everything beneath him is as solid and as immovable as the proverbial rock. Geologists tell us, however, that there are some layers of subterranean soil which far from being stationary and unmovable, show themselves to be as unsteady as layers of some oriental cheeses which are in constant ferment because of vermiculose inhabitants. Such seems to be the nature of detritus soil, which moves and creeps, as a restless sleeper. And it was in this kind of soil that the telltale pipe in this case was laid, the movement of the soil being accentuated by the fact that here it lay on a 15% slope.

The agitation of the detritus soil imposed great strain on the gas pipe, particularly at the point of the threaded coupling, its weakest point. The plaintiffs maintained that it was negligence in itself to place the coupling so close to the house wall. A proper regard for safety would have dictated a straight, unbroken pipe through the house wall and out toward the curb box.

It was testified at the trial that not only did the gas pipe rest in an uneasy bed of detritus, but, in addition, what lay beneath it offered no rigid support, since this terrain consisted of a fill which had not been tamped down.

The contractor Alberts testified that, after he had laid the water line, he covered it with a 18″ layer of loose, untamped earth and then laid the gas service line on top of that. In time the filled-earth below impacted and the gas line sagged under the weight of the earth above it, all leading to the fatal break. The plaintiff contended that all this was foreseeable and, because of this foreseeability, the gas company was li-

able for the disaster which ensued, since the gas company had inspected the gas line after it was put into place and before gas was turned into it.

The two engineers called by the plaintiffs testified that if the gas line had been placed in the residual crust, beneath the detritus stratum, the agitation of the latter could not have moved the pipe to such an extent as to break the coupling which parted as a result of the stress it could not endure.

As technical as this explanation might perhaps seem, it was explained in very simple and window-clear language to the jury by the long experienced, able trial judge and there is no reason to believe that the negligence which the jury attributed to the defendants by its verdicts was not based on a thorough understanding of the issues involved.

The appellant gas company contends it cannot be held responsible for the accident since its only obligation was to examine the pipe at its original laying to see that the pipe did not leak, and that it was laid in a trench of acceptable depth and grade. Also, it claims, the company was not required by law to examine the soil tunnelled by the pipe. This is a rather apathetic appraisement of the duties resting upon the carrier of a highly dangerous substance. It would be like saying that the keeper of a zoo has only the responsibility of seeing that the tiger is placed in a cage with bars, unconcerned with whether the bars are made of steel or papier maché. Until the tiger leaps at the bars, the paper stockade of course will surround the tiger, but that stockade will be wholly useless, once the savage animal stirs. The responsibility of a gas company is to see to it that the highly inflammable commodity it is selling is contained within a casing, formidable enough to withstand the pressure or violence to which it could foreseeably be subjected. An automobile tire

is tested on a rough and rocky road, not on a ballroom floor.

The plaintiffs maintained that the conduit would have been better able to withstand the stress and strain to which it was to be subjected if, instead of being a thin walled black steel pipe, it had been galvanized or made up of wrought iron. Certainly the appellant could not argue that it had performed its duty of inspection, only so long as it was satisfied that the pipe was strong enough to carry gas during the period of inspection but, in all likelihood, would suffer rapid deterioration and eventual breakage later.

In *Goodman & Theis, Inc. v. Spring-Brook Water Service Co.*, 352 Pa. 488, this Court said that if the gas company knows there are defects in the pipe carrying its product to a consumer or "is in possession of facts which should reasonably inform it that it is unsafe, it then becomes its duty to investigate the safety of the pipe before it continues to use it for the transportation of gas, and if it fails in that duty it becomes liable for any resulting accident."

In view of the quantity and quality of evidence submitted by the plaintiff that reasonable care in inspection would have revealed to the gas company inspector the inherent defects in the pipe and its terrestrial couch, all of which could lead to disaster unless corrected, the jury was warranted in finding the company was negligent in not heeding the signs which spelled out to a person informed on the subject that an explosion was on the way some day.

In *Stephany v. Equitable Gas Co.*, 347 Pa. 110, we said "The company knows that it is dealing with a dangerous agency and if it knows or should have known that the consumer's lines are not safe it is its duty to require the lines to be repaired or else to shut off the gas at the curb."

The case of *Heller v. Equitable Gas Company,* 333 Pa. 433, contains facts which well illustrate the responsibilities devolving upon a gas company where leakage or seepage in a gas pipe may, from existing known circumstances, lead to explosion. There, the gas company's employees replaced a portion of the consumer's line after a leak had been discovered. No complaint was made as to the manner in which the repair was accomplished. Later, an explosion occurred in a part of the line which had not been replaced. The gas company argued, in the ensuing litigation, that it could not possibly be liable for the resulting damage because it had made all the usual tests for gas at or near the point of the union, after making the repair, and there was no reason to believe that the pipe was defective. This Court, in sustaining a verdict for the injured plaintiff, said: "Defendant was obligated to go further, in view of the knowledge acquired of the condition of the pipe and the *character of the ground* in which it was laid, and to ascertain whether the corrosion extended to the remaining portion of the line, before turning gas into it and advising plaintiff 'it was all right.'" (Emphasis supplied).

Our Court said further: "It is conceded by defendant in its brief that it knew at the time the work was done '*of the filled ground,* and that the adjacent pipe then looked to be corroded and in bad condition, then it might be said that possible future leaks could reasonably have been foreseen by it, and failure to shut off the gas or do further work was negligent.' Such facts are disclosed by the record before us, and the jury was justified in finding that defendant was negligent." (Emphasis supplied).

The defendant gas company here argues that even if it knew the gas line was imbedded in detritus soil, this knowledge would not flash any warning of danger since that condition "is not so obviously dangerous as

to be recognized by all reasonably intelligent persons." Where any force so potentially destructive as gas or electricity is involved, the test is not how the normally intelligent person might view it, because, in the first place, these two substances are invisible and, in the second place, knowledge of resistance of pipe to pressure of gas and constituency of terrestrial strata is not within the compass of knowledge of the average lay person. The test must be made by persons competent in the field under scrutiny. To the man on the street stone is stone and dirt is dirt, but there are geologists and engineers who can read books in stone, volumes in terrain, and to whom every little thread on a coupling unwinds an entrancing story not intelligible to the person stranger to the scientific technical world. To a lay person a coupling is a coupling, but the man versed in all the mechanical theories of stress and strain, can tell by examining a coupling or pipe, together with an analysis of the enveloping land and other applicable circumstances, how long such a coupling or pipe may safely carry an explosive substance. Did the gas company inspectors conduct the tests which would enlighten them on possible danger?

It is futile to argue, as the defendant gas company does, that it was not the responsibility of its inspector to study the enveloping conditions which might contribute to a possible explosion. Of what possible use is a test unless it embraces a professional study of phenomena which, while unintelligible to the average layman, speaks with trumpet tongue to the specialist?

The gas company cites the case of *Kosco v. Hachmeister, Inc.*, 396 Pa. 288, in support of its argument of nonliability and states in its brief: "this Court, in the year of the accident, stated that detritus creep 'is not great enough to damage structures built on the land.'" This is putting the head of a lion on the body of a bull moose. That case had to do with an enormous

landslide which caused the destruction of numerous houses in Stowe Township and the trial court found that the earth's movement was due to the defendants' negligent removal of lateral support from the hillside. Our Court said in review: "The real issue was whether the causation was a landslide or a creep, which is the slow and imperceptible downhill movement of land responding, as it does on any hillside in the world, to the force of gravity: creep is not great enough to damage structures built on the land."

The question in this case is not whether the defendant's house suffered annihilation because of excavation done by the defendants. The issue is whether the defendant gas company was negligent in the manner in which it inspected subterranean pipe. Thus the *Kosco* case is wholly inapposite.

Moreover, the negligence charged to the defendant did not rest with the detritus bed of the pipe. There were other features of the pipe laying which, apart from the detritus environment, caused the tragic break in the pipe. Emerson Venable, a chemist and chemical engineer, was asked: "leaving aside for a moment detritus and directing your attention to filled ground, if a pipe is laid on top of fill, is there any particular hazard in connection with that pipe?" He replied: "Yes. What happens in laying it on fill is a matter of settlement in which the settlement goes downward underneath the pipe and the weight of the soil above eventually presses down on the pipe. Q. Was this dangerous and hazardous condition of the installation something that could be observed upon reasonable inspection before the line was covered? A. Yes. This would be apparent to any inspection—any inspector looking at the pipe."

Albert Kisner, the plumber who laid the pipe, testified: "Q. In your opinion, Mr. Kisner, is there any risk or hazard in connection with laying a gas service

line on top of filled ground if the line is not supported with piers? A. Yes, there would be a hazard. Q. What is the hazard? A. The ground would settle allowing the line to settle down."

Then the defendant argues that, once it has done what is customarily done in a given situation, it may dust its hands of all responsibility. What is usually done is not always the criterion of what should be done. If life would depend only on the hit-or-miss status quo, there would never be any improvement. Where explosive compounds are in play, the measure of care arises with the degree of hazard involved. The law on this subject was laid down with magisterial finality in *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, where this Court said: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question. Reason does not have to wait on usage; the latter must wait on reason. . . In the case of Zartner v. George, 156 Wis. 131, 145 N.W. 971, the Supreme Court of Wisconsin aptly said: 'If the act in question is obviously dangerous, then evidence of custom is inadmissible, because custom cannot change the quality of an act. . . Hence, when its quality clearly appears from the act itself, there is no need to invoke the aid of custom to determine it.' "

In his usually piquantly expressive language, the great Justice OLIVER WENDELL HOLMES said, as quoted in *Hudson v. Grace*, 348 Pa. 175, " 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' " Did the gas company here exercise reasonable prudence? This question was put to the jury as clearly

as a chalked picture on a blackboard to primary graders, and the jury found that the defendant had not exercised "a standard of reasonable prudence."

Even if the custom for decades had been to lay pipes in detritus soil, with no untoward results, this still would not absolve the gas company, if its inspectors knew, or should have known that detritus soil moves, creeps and pressures or dislodges gas pipes of the character here described. If five successive lighted matches thrown into a gasoline barrel did not ignite its contents (because of wind currents, extraneous elements, pure fortuity, plus that indefinable unpredictable element known as chance or luck) this still would not proclaim the match-thrower a reasonable and prudent person. In *Donnelly v. Whittaker,* 364 Pa. 387, this Court said: "Here, reasonable prudence dictated that some warning be given before pushing down bales weighing 700 pounds. . . The fact that they never gave a warning is no excuse. *Negligence can never be justified by repetition."* (Emphasis supplied).

The rule here in point was well crystallized in the statement by this Court in *Rubin v. Goldner,* 380 Pa. 240: " 'While custom or practice prevailing in a particular business in the use of methods, machinery and appliances is a most important factor in determining the question of negligence, ultimately it is for the jury to find whether under all the evidence—particularly where, as in the present case, it consists of oral testimony—the defendant was negligent.' "

Immediately after the explosion, the gas pipe was dug up and, as already indicated, the coupling connecting the inner installation with the outside pipe was discovered to be located only one foot from the house, an indication in itself of negligent plumbing. In fact, Albert Kisner, the plumber testified: "Yes, I said if I had laid the line in that particular way then I had did a very bad job. It was a very bad job because,

well, I didn't approve of it myself. I said it was a bad job." Kisner was somewhat equivocal in his testimony as to whether he had installed the culpable coupling. He finally said he was not certain. It is the position of the defendant gas company that at the time the pipe was inspected and approved in 1946, it did not have a coupling one foot away from the foundation wall of the house. The plaintiff produced four or five neighbors who lived in the immediate vicinity of the plaintiff's house from the time it was constructed. They testified that during the period intervening between the original installation and the time of the accident, the ground had not been dug up, the only way in which, of course, the coupling could have been installed if it was not there in the original installation.

What we have here at best is a question of fact for the jury, and the jury resolved it in favor of the plaintiffs. In considering motions for judgment n.o.v., we of course read the testimony in the light most favorable to the verdict winner.

The gas company also complains that the plaintiffs did not establish that the neglect of the defendant, if there was any, was the proximate cause of the accident. The trial court clearly defined to the jury the role of proximate cause in the case, and the transcript of the record abundantly supports the jury's findings in this respect. It need only be added here that the plaintiffs' evidence does not have to be such as to preclude any other possible explanation for the mishap. We pointed out in *Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, that where circumstantial evidence is the foundation of a verdict, the successful plaintiff is entitled to keep his verdict if the circumstances are such that the jury could have reasonably inferred the facts necessary to establish liability: "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough

that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant."

Finally, the defendant gas company charges the plaintiffs with contributory negligence. This is like blaming someone on earth for the eclipse of the moon. The defendant argues that in the ten years the plaintiffs lived in their house, they never did anything to ascertain what effect the soil movement was having on their gas pipe. There is no rule which requires a householder to dig up the ground around his house periodically to make certain that his gas and water pipes are operating perfectly. The plaintiffs purchased this house three years after the pipes had been laid. Neither the husband, a poorly-educated laborer, nor the modest housewife, was a geologist, logician, mathematician or clairvoyant. They had no way of knowing what could happen, they had no reason to believe that the gas company to which they regularly paid their bills might have been negligent in inspecting the conduits which brought them fuel for cooking and for heat. Even so, the trial court in its charge, which covered all the issues with the amplitude of a circus tent, and with the precision of an archer's arrow, instructed the jury that if they found the plaintiffs guilty of contributory negligence they could not recover.

With regard to the additional defendant, W. W. Alberts, it is enough to say that if the gas company can be held liable for failing to note negligent construction, the contractor is certainly responsible for causing that negligent construction. In any event, as stated by the lower court, "there was ample testimony from which the jury could have found that he [the contractor] participated in the laying of a defective line in a negligent

manner, that he failed to make a reasonable inspection of the finished line, and that he thus accepted a hazardous installation for use as a line to transport a highly dangerous substance."

Judgments affirmed.

Mr. Justice COHEN and Mr. Justice ROBERTS concur in the result.

Mr. Chief Justice BELL dissents.