552 A.2d 1109

Percy DALLAS and Josephine Dallas,

v.

F.M. OXFORD INC., John W Merriman, James K. Stone, Delaplaine McDaniel Ind. and d/b/a McStome, M.A. Kravitz Co. a/k/a Kraftco Inc. and F.M.L. Assoc. Ltd., Appellant.

Percy DALLAS and Josephine Dallas,

v.

F.M. OXFORD INC., John W Merriman, James K. Stone, Delaplaine McDaniel individually and d/b/a McStome and Otis Elevator Co. and M.A. Kravitz Co. a/k/a Kraftco Inc. and F.M.L. Assoc. Ltd.

Appeal of OTIS ELEVATOR CO.

Percy DALLAS and Josephine Dallas,

v.

F.M. OXFORD INC., John W Merriman, James K. Stone, Delaplaine McDaniel Ind. and d/b/a McStome, Otis Elevator Co., M.A. Kravitz Co. a/k/a Kraftco Inc. and F.M.L. Assoc. Ltd.

Appeal of F.M. OXFORD INC., John W Merriman, James K. Stone, Delaplaine McDaniel Ind. and d/b/a McStome, M.A. Kravitz Co. a/k/a Kraftco Inc. and F.M.L. Assoc. Ltd.

Superior Court of Pennsylvania.

Argued June 20, 1988.

Filed Jan. 13, 1989.

Theodore H. Lunine, Philadelphia, for F.M. Oxford Inc., et al.

Kevin Connors, Philadelphia, for Otis Elevator Co.

Christian C. Thompson, Philadelphia, for Percy and Josephine Dallas.

Before MONTEMURO, BECK and POPOVICH, JJ.

POPOVICH, Judge:

The plaintiffs (Percy and Josephine Dallas) recovered a verdict for damages for personal injuries suffered by Mr. Dallas when he was struck by the doors closing on an

elevator in the Oxford Valley One building in Langhorne, Pennsylvania.

The court *en banc* denied motions for judgment n.o.v. and for a new trial by opinion, the judge who presided at the trial having resigned his office prior to ruling on post-verdict motions. The defendants [1] appeal from the judgment entered on the verdict and assign various errors to the lower court's refusal to grant judgment n.o.v. and/or a new trial. We affirm.

In considering a motion for judgment n.o.v., the evidence, together with all reasonable inferences to be derived therefrom, is to be considered in a light most favorable to the verdict-winner. *Evans v. Otis Elevator Co.*, 403 Pa. 13, 17, 168 A.2d 573, 575 (1961). With the evidence viewed under such a standard, the material facts may be summarized as follows.

At approximately 11:30 a.m. on the 2nd day of December, 1977, Mr. Dallas and his wife entered the Oxford Valley One building. Their intention was to travel to the sixth floor and conduct business with a health insurance company. At the time, Mr. Dallas was 75 years old and walked with a cane to relieve the pressure on his arthritic knees. As the two entered the elevator, they did so without incident and ascended to the sixth floor. Mrs. Dallas stood about 12″ to 18″ from the door and her husband was "about a foot" behind her, a little to her left. There was no one else on the elevator.

As told by Mr. Dallas:

When the elevator reached the sixth floor, the doors opened, my wife stepped out and I followed her immedi-

---

1. The defendants, F.M. Oxford, Inc. John W. Merriman, James K. Stone and Delaplaine McDaniel, individually and doing business as defendant McStome, a general partnership, and defendant F.M.L. Associates, Ltd. jointly owned the Oxford Valley One building. As for defendant Otis Elevator Company, it built and installed the elevator in question and had a service contract with F.M. Oxford, Inc. to make quarterly inspections of the elevator used by the plaintiffs.

ately. I had my left foot out on the floor, over the crevice from the elevator and the floor, and I took my cane out and put it out on the floor and I was in the process of stepping out, when my right foot was up in the air, my left foot was on the floor, taking the weight, that's when I felt this hard hit on my shoulder.

It took Mrs. Dallas "no more than two or three seconds" to exit, and the plaintiff was behind her. With his left shoulder being hit, this knocked him "sideways, to the right." The left shoulder was at an angle and still within the elevator at the time of the accident. The force of the contact with the elevator door caused the plaintiff to fall on his right side to the floor. Medical aid was summoned and he was transported to the hospital, where x-rays showed a fractured right hip. Thereafter, the plaintiffs filed a six-count complaint in trespass sounding in strict products liability (Restatement (Second) of Torts, § 402A) and negligence. However, at trial it was disclosed that the cause of action under Section 402A was "waived", and the case was proceeding solely on the negligence ground.

The plaintiffs' expert (Martin S. Maurer) testified that the two-door elevator found in the building where the accident occurred was independently operated. It had a "safety edge" (made of rubber) that ran the length of each door, and, if contacted, would retract the doors to the open position. Likewise, a button located on the inside of the elevator, when depressed, would inhibit the doors from opening. No other safety device was present, despite the fact that a "photoelectric cell" [2] was available as a safety feature on elevators since the late 1930's. Further, the expert stated that the photoelectric cell could be affixed to existing elevators (between the outer and inner doors) at a moderate cost ($100.00). The light-sensitive cell would be positioned on two locations: (i) a few inches off of the

---

**2.** A photoelectric cell was defined as an electric device or component. It is light activated. If there is no beam of light striking the cell, *i.e.,* the beam is interrupted, there is no motion and the doors are not capable of closing.

landing; and (ii) approximately two feet above the initial installation.

As opined by the plaintiffs' expert, had there been a photoelectric cell on the elevator, the accident would not have occurred. Even though this witness conceded, in response to questioning from the court, that he was not aware of any written standards requiring the installation of a photoelectric cell in elevators, he also stated that "the photoelectric devices are the common means of preventing incidents" such as took place with Mr. Dallas. He based this upon his "experience" and "good engineering design". He knew of what he spoke since he was a licensed mechanical engineer and had designed an elevator for the space program and for a private concern.

For the sake of completeness, we wish to give an accounting of the defendants' version of the case and law on the subject at hand. For example, the defendants' witnesses recounted how there had never been any previous injuries sustained as a result of being struck by the elevator doors in the Oxford Valley One building. Nor was there any evidence that the elevator in question had not been licensed by the Commonwealth of Pennsylvania, Department of Labor and Industry, Elevator Division. In fact, the elevators in this Commonwealth are inspected quarterly, and the elevator here had met "all Department regulations."

Lastly, the defendants' expert testified that the standards of the American National Standard Institute (ANSI),[3] of which he was a board member and helped promulgate some of its regulations regarding construction of elevator doors, had been complied with in all respects in the design of the elevator under scrutiny.

Of interest to this Court is the comment of the defendants' expert that, of the approximately 5,000 elevators produced annually since 1970, about 60% had been equipped

---

**3.** ANSI is an organization which oversees the many standards which exist in our technological society. Also, Pennsylvania was stated to have adopted ANSI standards for elevators. *See* Reproduced Record at 308a.

with only "safety edges." And, that the elevator here was manufactured, constructed and installed in accordance with the industry standards. Moreover, it was his opinion that the accident involving Mr. Dallas would not have been prevented had a photoelectric cell been present. He felt that the plaintiffs' failure to utilize the safety features in place (touching of the rubberized "safety edges" on the doors or the depression of the "hold button") played a role in the accident.

As for ANSI standards, contained specifically in paragraph 1.12.5 of its rules, the only requirement for automatic elevators was that they have a "reopening device." This paragraph has not been altered, and the expert should know because he is chairman of the subcommittee responsible for overseeing this aspect of ANSI standards. As a result thereof, and as stated previously, of the 5,000 elevators built in this country yearly since 1970, only 60% had "safety edges." The expert furthered proffered "they would not have had [a] photoelectric cell. It's like wearing a belt and suspenders...."

With the completion of the defendants' expert's testimony, the case came to a close. As for the charge read to the jury, a portion recited the standard of care owed by the defendant/F.M. Oxford, Inc. to the plaintiffs; to-wit:

Under the law, a defendant who owns and operates a building in which elevators are used also has a duty to provide persons using that elevator with the highest degree of protection that human knowledge, skill, foresight and care can provide, although this legal duty does not make the owner absolutely responsible.

The defendant/F.M. Oxford, Inc. took exception to this charge when it was being requested by counsel for the plaintiffs in chambers. Nonetheless, the exception was denied, and the jury returned a verdict finding F.M. Oxford, Inc. 45% negligent, Otis Elevator Company 45% negligent and the plaintiffs contributorily negligent in the amount of

*10%.* Because of improperly elicited testimony from the plaintiff's wife, as to her receiving psychiatric care since the accident, the parties stipulated to the damages of $40,000.00, a matter with which the jury was not to concern itself during its deliberations.

With the denial of post-verdict motions and the reduction of the verdict to judgment, this timely appeal followed and raises several issues for our evaluation. The first relates to whether the plaintiffs failed to provide direct proof that there was a deviation from the accepted standards in the industry as to the design of the elevator door system, and, therefore, failed to make out a case of negligence. (*See* F.M. Oxford, Inc., et al.'s Brief at 9–10; Otis Elevator Company's Brief at 9)

We commence our assessment by observing that in this jurisdiction the "custom or practice of the industry" standard has been roundly criticized and generally disapproved. *See Welsh v. Kleiderer,* 440 Pa. 47, 269 A.2d 746 (1970); *see also McKenzie v. Cost Brothers, Inc.,* 487 Pa. 303, 311, 409 A.2d 362, 366 (1979). In fact, our Supreme Court most recently discounted the applicability of the "custom or practice of the industry" standard in products liability cases. *See Lewis v. Coffing Hoist Division, Duff–Norton Co.,* 515 Pa. 334, 528 A.2d 590 (1987). *Accord Majdic v. Cincinnati Machine Co.,* 370 Pa.Super. 611, 537 A.2d 334 (1988) (*en banc*).

However, the status of the "custom or practice of the industry" standard appears to be an open question in the negligence area of the law. For example, our Supreme Court has stated in the past that:

> ... Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gauged. The standard of due care is such care as a prudent person would exercise under the circumstances of the particular case, and conformity to customary or

usual conduct or methods cannot amount to more than a circumstance to be considered together with other circumstances of the case in determining whether due care has been exercised: ...

"The common usage of the business is a test of negligence, but not a conclusive or controlling test":....
*MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, 397, 166 A. 589, 592 (1933). Our Supreme Court in *McKenzie*, supra, quoted the language reproduced from *MacDougall*, supra, to limit its use where an "inherently dangerous" condition existed, *i.e.*, one does not need evidence of industry custom and practice in such a situation; if the act in question is obviously dangerous, then evidence of custom is inadmissible because custom cannot change the quality of the act.

Furthermore, our own Superior Court has condoned the admission of standards, be it through expert testimony or the introduction of private and governmental regulations regarding a particular business or industry. *See, e.g., Wood v. Smith*, 343 Pa.Super. 547, 495 A.2d 601 (1985) (Instructions on government and industry standards submitted by the defendants and the plaintiff were properly admitted; remanded for a new trial because trial court failed to instruct jury on the relevance of such standards to the issue of negligence); *Kubit v. Russ*, 287 Pa.Super. 28, 429 A.2d 703 (1981) (Trial court erred in excluding evidence of customary practice of police in certain circumstances; customary practice is admissible to help the jury decide whether the defendant violated the duty of care it owed the plaintiff); *Brogley v. Chambersburg Engineering Co.*, 306 Pa.Super. 316, 452 A.2d 743 (1982) (Evidence of OSHA regulations is admissible as a standard of care, the violation of which is evidence of negligence); *Walheim v. Kirkpatrick*, 305 Pa.Super. 590, 451 A.2d 1033 (1982) (Trial court committed error in not allowing expert to describe the accepted customs and standards for the safe use of trampolines).

■ Notwithstanding the continued use of the "custom and practice" standard in negligence cases, it still remains the law that:

> Evidence of the customary practice within the industry although admissible is not essential to a finding of negligence. Indeed ... evidence of what usually is done is not necessarily what ought to be done, and is therefore not necessary to prove negligence. 294 F.Supp. at 654. *See, e.g., McAdoo v. Autenreith's Dollar Stores,* 379 Pa. 387, 392, 109 A.2d 156 (1954); *Maize v. Atlantic Ref. Co.,* 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 (1945); Harper and James, The Law of Torts § 17.3 at p. 977–82 (1956).

*Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1216 (3rd Cir.1970).

■ At bar, it is undisputed that the plaintiffs' expert was unable to point to any written standards in the industry which dictated the installation of a photoelectric cell in elevators; he premised his opinion of such on his own "experience" and "good engineering design." However, on this aspect of the case, we had evidence from the defendants' expert that, as far as ANSI standards were concerned, there was no requirement regarding photoelectric cells, and that the defendants acted in accordance with 60% of the market when it came to constructing, manufacturing, designing and maintaining the elevator involved in the accident.

Because we find that the degree of care to be exercised in this particular instance (passenger elevator accessible to the public at large) was accurately stated by the trial court,[4] the usage of the particular industry, and the obligations owed

---

**4.** For the defendant/F.M. Oxford, Inc. as the owner/operator of the elevator, the trial court correctly instructed the jury that the duty owed was one of "the highest degree of care" to passengers. *See McGowan v. Devonshire Hall Apartments,* 278 Pa.Super. 229, 240, 420 A.2d 514, 519 (1980); *Gabel v. 1528 Walnut St. Building Corp.,* 160 Pa.Super. 218, 221, 50 A.2d 751, 753 (1947). As for the defendant/Otis Elevator Co., the designer/installer of the elevator, it owed a duty to exercise "reasonable care" in its design of the elevator.

to the accompanying customer or patron of the product, is necessarily a question for the finder-of-fact. *See Aquadro v. Crandall–McKenzie & Henderson, Inc.,* 182 Pa.Super. 435, 439, 128 A.2d 147, 149 (1956). Stated otherwise, because of the manner in which the evidence was submitted (orally), and given the conflicting opinions of the experts on the question of the alternative safeguard suggested by the plaintiffs' evidence, the issue of negligence was properly submitted to the jury for resolution. *See Bethay v. Philadelphia Housing Authority,* 271 Pa.Super. 366, 377, 413 A.2d 710, 715 (1979); *see also Forry v. Gulf Oil Corp.,* 428 Pa. 334, 342, 237 A.2d 593, 598 (1968); *Hemrock v. Peoples Natural Gas Co.,* 423 Pa. 259, 271–72, 223 A.2d 687, 693 (1966); *Rubin v. Goldner,* 380 Pa. 240, 243, 110 A.2d 237, 239 (1955); *Maize v. Atlantic Refining Co.,* 352 Pa. 51, 57, 41 A.2d 850, 853 (1945); *Fox v. Keystone Telephone Co.,* 326 Pa. 420, 427–28, 192 A. 116, 119 (1937); *National Cash Register Co. v. Haak,* 233 Pa.Super. 562, 573, 335 A.2d 407, 412 (1975); *Aquadro,* supra, 182 Pa.Super. at 439, 128 A.2d at 149; *The T.J. Hooper Case,* 60 F.2d 737, 740 (2nd Cir.1932); *George v. Morgan Const. Co.,* 389 F.Supp. 253 (E.D.Pa.1975). In particular:

> "It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability * * * The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability on the defendant."

*Hemrock,* supra, 423 Pa. at 271–72, 223 A.2d at 693, *quoting Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, 138–39, 153 A.2d 477, 480 (1959).

We conclude, under the standard quoted from *Smith,* supra, that the jury was presented with sufficient evidence from which to infer that the defendants were negligent in failing to include a photoelectric cell on the elevator. *See*

*National Cash Register Co.*, supra, 233 Pa.Super. at 573–74, 335 A.2d at 412. Because of the nature of the product under scrutiny here (an elevator) and the standard of care associated therewith (*see* note 4, supra), we have no reservations in upholding the judgment of the court *en banc. Compare Larkin v. May Dept. Stores*, 153 F.Supp. 747 (W.D.Pa.1957) (Swinging doors); *McAdoo v. Autenreith's Dollar Stores*, 379 Pa. 387, 109 A.2d 156 (1954) (semble).

The remaining issues proffered by the defendants have been reviewed and are found to be meritless and, accordingly, do not require further discussion.[5]

JUDGMENT AFFIRMED.

**5.** Otis Elevator Company's final contention, *i.e.*, the design of the elevator door was not negligently done and, thus, warranted a judgment n.o.v., is necessarily found to be wanting given our initial conclusion that compliance with standards in the industry does not exonerate one from a finding of negligence in failing to install a photoelectric cell on the elevator. The trial court stated as much in its charge to the jury. See Reproduced Record at 435a–436a.

F.M. Oxford, Inc., et al., raise three additional questions. The first claims that the trial judge committed reversible error in not allowing it to cross-examine the plaintiffs' expert on the question of the defectiveness of the elevator. This would have, supposedly, supported F.M. Oxford, Inc.'s cross-claim of indemnity or contribution against Otis Elevator Company under Restatement (Second) of Torts, § 402A criteria. It, purportedly, was still pursuing a Section 402A cause of action.

To begin with, during trial all parties agreed that the case was to be tried solely on negligence grounds and the Section 402A portion of the suit was being "waived." F.M. Oxford, Inc. gave no indication to dispel this notion. Thus, it will not be heard to complain now. Moreover, whether a different safety device might have been a better or preferable design under the circumstances goes to the issue of due care in making that choice and sounds in negligence, not strict liability. *See Abdul–Warith v. Arthur G. McKee and Co.*, 488 F.Supp. 306, 314 (E.D.Pa.1980). The second issue (captioned under Paragraph II, Subparagraph B) is intertwined with the previous issue and, consequently, is denied as meritless.

The last protestation of F.M. Oxford, Inc. seeks our abrogation of the "highest degree of care" standard in elevator cases. *See* note 4, supra. We are not inclined to alter the settled standard, and the defendant's reference to Prosser, Law of Torts, 4th ed., p. 81 (that the standard is really not a departure from the reasonable man standard) is not persuasive.